# File No. _____

# Emergency Motion for a Writ of Certiorari

## Charity Colleen Crouse

## vs.

## Neuropsychiatric Center, et al

## United States District Court for the Southern District of Texas

## Sept. 25, 2017

**JURISDICTION**

This "Emergency Motion for a Writ for Certiorari" is filed is filed under Federal Rules of Appellate Procedure 27.1.6 and 27.1.9. An Emergency Motion is requested per FRAP 27.3.

**The United States District Court for the Southern District of Texas has jurisdiction in this matter as this "Emergency Motion for a Writ of Certiorari" is submitted under the IV and VI Amendments of the U.S. Constitution and concerning violations of 18 U.S.C. §2384, §2384 and §2385.**

**SUMMARY OF ARGUMENT**

This "Emergency Motion Writ of Certiorari" is filled in the United States District Court for the Southern District of Texas today regarding a "Petition for an En Banc Review by the Texas Supreme Court of the Plenary Power of Courts of Appeal to Review an Order of Protection for the 3-day Emergency Detention of Charity Colleen Crouse by the Neuropsychiatric Center in Harris County Probate Court, March 27, 2017 filed by C. Colleen Crouse *pro se*" that was submitted to the Texas Supreme Court on June 2, 2017 and was marked as denied on June 8, 2017 for lack of jurisdiction. The Petition was resubmitted to the Texas Court of Criminal Appeals on June 20, 2017 and was allegedly accepted for filing on June 21, 2017 as a "Writ of Habeas Corpus." Numerous improprieties regarding filing requirements and actions by two different Clerks of the Court, however, compel consideration of efforts to sabotage the litigious process for

purposes of large-scale securities fraud aimed at extorting first responders in the State of Texas, among other crimes. These efforts have been revealed to coordinate with efforts of members of the Houston City Council to commit fraud during the approval of a package of municipal ordinances concerning the Federal Flood Plain Insurance Program and Texas Legislators and the Attorney General's refusal to prevent that fraud that compelled a "Writ for a Leave of Information in the Nature of Quo Warranto" that was filed in the Texas Supreme Court on Aug. 3, 2017. The Writ alleged that these efforts contributed to an effort at Sedition against the People of the State of Texas and called into question the authority of Legislators and an Attorney General who refused to suppress it.

The Writ for Quo Warranto was referred for review by the Court on Aug. 15, 2017. The Writ was denied on Sept. 15, 2017. Nonetheless, additional crimes concerning extortion of first responders, undermining the economic security of the People of the State of Texas and the People of the United States of America, and contributing to an effort of Sedition against the People of the State of Texas and the People of the United States of America have prevailed. This includes ongoing acts of fraud involving the Houston Police Pension Fund, fraud against the bonds of various law enforcement officials, and abuse of the judicial process in the commission of numerous crimes.

**The court is requested to accept this as an Emergency Appeal.**

Original documents, including original formatting of various motions and Petition filings, are attached as Appendices.



Change                                                    ($7.25)

Includes up to $50 insurance

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Text your tracking number to 28777
(2USPS) to get the latest status.
Standard Message and Data rates may
apply. You may also visit USPS.com
USPS Tracking or call 1-800-222-1811.

*********************************
BRIGHTEN SOMEONE'S MAILBOX. Greeting
cards available for purchase at select
Post Offices.
*********************************

Save this receipt as evidence of
insurance. For information on filing
an insurance claim go to
https://www.usps.com/help/claims.htm.

Order stamps at usps.com/shop or call
1-800-Stamp24. Go to
usps.com/clicknship to print shipping
labels with postage. For other
information call 1-800-ASK-USPS.

STATE OF TEXAS

COUNTY OF HARRIS

Case No. _____

### TEXAS GENERAL AFFIDAVIT

RE: Petition for an En Banc Review by the Texas Supreme Court of the Plenary
Power of Courts of Appeal to review an Order of Protection for the 3-day
Emergency Detention of Charity Colleen Crouse by the Neuropsychiatric Center in
Harris County Probate Court, March 27, 2017 filed by C. Colleen Crouse *pro se*

Before me, the undersigned authority, this day personally appeared Charity Colleen Crouse

Who after being by my duly sworn, deposes under oath that:

1) My name is Charity Colleen Crouse
2) I am over 18 years of age and am a resident of the State of Texas. I have personal
   knowledge of the facts contained herein, and if called as a witness, could testify
   competently thereto.
3) I have composed and had notarized this Petition for Review.
4) I am the Plaintiff in this case.
5) I am representing myself pro se.

I declare under perjury that the foregoing is true and correct.

Executed this ⟨2⟩ day of ⟨June⟩, 2017 in
⟨Houston, TX⟩

Notarized by ⟨Ramona Z Flores⟩

On ⟨6-2-17⟩

RAMONA Z FLORES
3212473
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
SEPT 12, 2020

1

**Case No.:** _____

**File date:  June 1, 2017**

Petition for an **En Banc Review** by the Texas Supreme Court of the Plenary Power of Courts of Appeal to review an Order of Protection for the 3-day Emergency Detention of Charity Colleen Crouse by the Neuropsychiatric Center in Harris County Probate Court, March 27, 2017 filed by C. Colleen Crouse *pro se*

C. Colleen Crouse
℅ Crossroads at Park Place
3827 Broadway, Box C
Houston, TX 77017
charity.colleen.crouse@gmail.com
no phone or fax available

2

# **Table of Contents**

Table of Statutes                                           2

List of Parties                                             5

Statement of Case                                          14

Statement of Errors for Review                             15

Statement of Facts                                         18

Summary of Argument                                        20

Argument                                                   21

Prayer for Relief                                          31

Statutes                                                   33

Appendix                                                   50

Formal Bill of Exception                                   57

Appendix to Formal Bill of Exception: Statutes            69

**Table of Statutes**

Texas Constitution, Bill of Rights, Article 1. §26

Texas Constitution, Legislative Department, Article 3, Chapter 65, Subchapter B. §65.011(2)

Texas Constitution, The Powers of Government, Article 2, Subtitle G, Chapter 81, Subchapter A. "The State Bar Act." §81.077

The Health Insurance Portability and Accountability Act, §164.506 "Consent for Uses or Disclosures to Carry Out Treatment, Payment or Healthcare Operations"

The Health Insurance Portability and Accountability Act, §164.506 "Consent for Uses or Disclosures to Carry Out Treatment, Payment or Healthcare Operations"

Texas Health and Safety Code, Title 7, Mental Health and Intellectual Disability, Subtitle C, Texas Mental Health Code, Chapter 576, "Rights of Patients," §576.002. "Presumption of Competency."

Texas Health and Safety Code, Title 7, Mental Health and Intellectual Disability, Subtitle C, Texas Mental Health Code, Chapter 576, "Rights of Patients," §576.006. "Rights Subject to Limitation."

Texas Health and Safety Code, Title 7, Mental Health and Intellectual Disability, Subtitle C, Texas Mental Health Code, Chapter 576, "Rights of Patients," §576.009. "Notification of Rights."

Texas Health and Safety Code, Title 7, Mental Health and Intellectual Disability, Subtitle C, Texas Mental Health Code, Chapter 576, "Rights of Patients," §576.010. "Notification of Trust Exemption."

Texas Health and Safety Code, Title 7, Mental Health and Intellectual Disability, Subtitle C, Texas Mental Health Code, Chapter 576, "Rights of Patients," §576.021. "General Rights Relating to Treatment."

Texas Health and Safety Code, Title 7, Mental Health and Intellectual Disability, Subtitle C, Texas Mental Health Code, Chapter 576, "Rights of Patients," §576.025. "Administration of Psychoactive Medication."

Texas Health and Safety Code, Title 7, Mental Health and Intellectual Disability, Subtitle C, Texas Mental Health Code, Chapter 576, "Rights of Patients," §576.027. "List of Medications."

U.S. Code Title 21, Chapter 13, Subchapter I, Part A. §801(2)

P. Law No. 104-132, 110 Stat. 1214. Anti-Terrorist and Effective Death Penalty Act of 1996, §702.2332b. "Acts of Terrorism Transcending National Boundaries."

P. Law No. 104-132, 110 Stat. 1214. Anti-Terrorist and Effective Death Penalty Act of 1996. §726. "Addition of Terrorism Offenses to the Money Laundering Statute."

Texas Rules of Appellate Procedure, §26.1. "Civil Cases"

Texas Rules of Appellate Procedure, §19.1. "Plenary Power of Courts of Appeals"

Texas Rules of Appellate Procedure, §34.5. "Clerk's Record"

Texas Rules of Appellate Procedure,  §53.2. "Contents of Petition"

10 U.S. Code, §948. "Definitions"

10 U.S. Code, §82. "Jurisdiction of courts-martial not exclusive"

10 U.S. Code, §836. "President may prescribe rules"

10 U.S. Code, §810, Article 10. "Restraint of persons charged with offense"

18 U.S. Code, "Racketeer Influenced and Corrupt Organizations (RICO) Act," Part 1, Chapter 96, §1961. "Definitions."

**List of Parties**

The following is a list of Parties involved with this petition:

a.  Texas Medical Board, 333 Guadalupe, Tower 3, Ste. 610, Austin, TX:

Several grievances were sent to the Texas Medical Board on April 6, 2017

concerning practitioners at the Neuropsychiatric Center and West Oaks

Hospital who subjected Charity Colleen Crouse to a 3-day Emergency

Detention for mental health hold that was extended an additional 7 days that

facilitated her trafficking through the mental health and social services

system and obstructed her efforts to report on racketeering activity as part of

an investigation with which she was engaged. As of May 21, 2017—45 days

after the submission of the grievance which is when the Texas Medical

Board responds to a grievance it deems worthy of further consideration—

Crouse had not heard back from the Texas Medical Board. The Texas

Medical Board is currently under review by the Texas Legislature's Sunset

Review Commission; refusal to acknowledge Crouse's grievances and their

implications is proof that the Texas Medical Board is intentionally

7

attempting to obstruct an investigation Crouse had declared to both hospitals
upon her admission in order to prevent any of the elements of the
investigation from being verified to impact the decision of the Sunset
Review Commission. Grievances were filed against:

1. Dr. Nguyen, Neuropsychiatric Center

2. Dr. Sayed, Neuropsychiatric Center

3. Dr. Pakeur, Neuropsychiatric Center

4. Dr. Buttar, West Oaks Hospital

b. Texas Bar Association, 600 Jefferson St., Houston, TX: Crouse filed a
grievance on April 6, 2017 with the Texas Bar Association against Arlene
Guzick, the court-appointed attorney in the hearing for the Order of
Protection for 3-day Emergency Detention. Guzick did not follow up on
Crouse's request to attend the April 3, 2017 hearing set for her in the Harris
County Probate Court to challenge the issuance of the Order of Protection.
Guzick additionally neglected to inform Crouse of her right to attend a
March 29, 2017 hearing on the Order of Protection to address using restraint
to hold her; Crouse was told about it as a method by staff at West Oaks

8

Hospital to attempt to coerce her into withdrawing from the April 6, 2017.
As of May 6, 2017, the Texas Bar Association had refused to respond to the
grievance Crouse had filed via their online portal for those seeking to file a
grievance with the Disciplinary Committee of the Texas Bar Association.

The Texas Bar Association election of members of its Board of Directors
occurred on May, 25, 2017. Current statistical information for the Texas Bar
Association alleges that there are no records of successfully-challenged
Emergency Detentions for mental health holds. Had Crouse's grievance
been acknowledged prior to the election then there would have to be a
reporting by the Texas Bar Association concerning the hold, which would
change the status of those numbers. These sorts of issues are behind
Crouse's challenges to the Order of Protection itself. Additionally, members
of the Texas Bar Association are aware that Crouse had been requested in
late November of 2016 to assist with an investigation of the Texas Bar
Association in preparation for the Texas Legislature's Sunset Review
Commission considerations of the Texas Bar Association. Crouse had been
requested by a Texas Bar Association member and legal ethics teacher to

9

assist with writing recommendations regarding ethics considerations; Crouse

had withdrawn from that request because she had been working on a long-

term investigation involving the human services system and had to that point

received no assistance from any member of the Texas Bar Association with

her efforts and did not wish to engage a conflict of interest. A grievance was

filed against:

      1.  Arlene Guzick


c.  West Oaks Hospital, 6500 Hornwood Dr., Houston, TX: A grievance was

filed against West Oaks Hospital concerning Dr. Buttar's refusal to consider

Crouse's attempts to report child abuse at a Domestic Violence Shelter at

which she had been staying prior to her Emergency Detention that had been

implemented by staff at the Neuropsychiatric Hospital or acknowledge that

Crouse was attempting to formally report on racketeering activity as part of

an investigation with which she had been involved concerning trafficking

through the human services system. Staff at the hospital repeatedly violated

numerous procedural issues regarding admission and treatment that were put

in place in order to be legally compliant for the purposes of Medicare and

Medicaid funding, including non-adherence to:

1. The Texas Patients' Bill of Rights

2. The Health Insurance Portability and Accountability Act (HIPAA)

Included in these patient protection violations were attempts to force

Crouse to engage in the consumption of controlled substances against her

will and without any appropriate education concerning side effects, how the

medication related to her diagnosis, what the dosage was, and even what was

the exact medication she was supposed to be taking at the time. A grievance

was filed with the Texas Medical Board against:

1. Dr. Buttar

Additionally, West Oaks Hospital was the site wherein Crouse was

introduced to and spoke with her court-appointed attorney. A grievance was

filed with the Texas Bar Association against:

1. Arlene Guzick

d. Neuropsychiatric Center, 1502 Ben Taub Loop, Houston, TX: Several

grievances were filed against the Neuropsychiatric Center concerning staff

refusal to consider Crouse's attempts to report child abuse at a Domestic

Violence Shelter at which she had been staying prior to the illegal 10-day

Emergency Detention and acknowledge that Crouse was attempting to

formally report racketeering activity as part of an investigation with which

she had been involved concerning trafficking through the human services

system. Staff at the hospital repeatedly violated numerous procedural issues

regarding admission and treatment that were put in place in order to be

legally compliant for the purposes of Medicare and Medicaid funding,

including:

1.  The Texas Patients' Bill of Rights

2.  The Health Insurance Portability and Accountability Act (HIPAA)

Included in these patient protection violations were attempts to force

Crouse to engage in the consumption of controlled substances against her

will and without any appropriate education concerning side effects, how the

medication related to her diagnosis, what the dosage was, and even what was

the exact medication she was supposed to be taking at the time. Grievances

12

were filed with the Texas Medical Board filed against:

    1. Dr. Nguyen, Neuropsychiatric Center

    2. Dr. Sayed, Neuropsychiatric Center

    3. Dr. Pakeur, Neuropsychiatric Center

e. Bridge Over Troubled Waters, 3488 Allen Genoa Rd., Pasadena, TX:

Crouse attempted to report child abuse at the Bridge Over Troubled Waters

Domestic Violence Shelter in Pasadena, TX to staff at both the

Neuropsychiatric Center and West Oaks Hospital during her Emergency

Detention. She was entered into the Emergency Detention in retaliation for

attempting to address issues of suspected child abuse involving children in

the Domestic Violence Shelter who were required to participate in the

Shelter's Day Care Center and also involving controlled substances that

mothers' were required to administer to their children in order to receive

myriad services even if those mothers objected to their children being

required to take ingest these controlled substances.

    Staff at the shelter were additionally violating their own internal

grievance procedures and other policies in illegally evicting women from the

shelter without following their process, as well as "cutting deals" with

different women in the shelter in order to coerce the women into acquiring

additional assistance from providers in the Shelter's network. These

mandates were levied regardless of whether or not the women wanted this

assistance in order to engage in experimental financial transactional

processes without the informed consent of the mothers or any opportunity to

withdraw from the experiments upon request. Crouse had endured personal

retaliation for attempting to report witnessing a staff member evict a woman

against procedure and permit at least two women to use their time at the

shelter to attempt to engage in fraudulent financial or drug deals while staff

permitted or enabled them.

Crouse had begun to discuss with other women in the Domestic

Violence Shelter the legal implications of the processes to which they were

being subjected and other women had engaged in personal legal research to

this and other effects. Crouse had cited legal precedents regarding the

Shelter's operations at which time Shelter Residential Director, Janelle,

mandated Crouse go to the Neuropsychiatric Center in order to get a "mental

health assessment" or transfer to another shelter, to which Crouse responded

that she would do both.

**Statement of Case**

This case requests an En Banc Review of the Plenary Power of Courts of Appeals for Harris County Probate Court for an Order of Protection for a 3-day Emergency Detention for mental health hold initiated by the Neuropsychiatric Center, 1502 Ben Taub Loop, Houston, TX, to obstruct an investigation of racketeering activity. This petition compels consideration of how laws related the Racketeer-Influenced and Criminal Organizations Act (RICO) qualify under the 1996 Anti-Terrorist and Effective Death Penalty Act, including charges related to human, arms and drug trafficking; extortion; kidnapping; and money laundering.

No name of presiding Judge can be provided. Hearing was to take place at the Harris County Probate Court, 2800 S. MacGregor between 9:00am and noon on April 3, 2017. The court's decision is unknown as client was prevented from attending and legal assistance was denied.

At this time the party to the appeal is Charity Colleen Crouse.

The appropriate Court of Appeals would be either District 1 or District 14.

No justice has yet been named.

No opinion has been made available to the client or put on the public record.

No decision has yet been rendered by the appropriate Court of Appeals.

**Statement of errors for review**

This petition seeks an En Banc Review of the Plenary Power of Courts of Appeals for the Harris County Probate Court for an Order of Protection for a 3-Day Emergency Detention for mental health hold as eligible under the Texas Safety Code Title 7, Subtitle C, Chapter 573, "Emergency Detention". On March 24, 2017, Charity Colleen Crouse was subjected to a 3-day Emergency Detention for mental health hold at the Neuropsychiatric Center, 1502 Ben Taub Loop, Houston, TX. Staff refused to adhere to the appropriate procedure for entering her by refusing to provide copies of pertinent documentation about her patients' rights or obtaining consent for treatment as prescribed under the Health Insurance Protection and Portability Act of 2013 or the Texas Safety Code Title 7, Subtitle C, Chapter 576, "Rights of Patients" (aka "Texas Patients' Bill of Rights").

Justification for the hold was alleged to be that Crouse 1) was a danger to herself, 2) was a danger to others, and 3) lacked capacity to make informed decisions about her treatment. However, Crouse asserted three times upon entry that she was 1) attempting to report retaliation by a Domestic Violence Shelter at which she had been staying, Bridge Over Troubled Waters, Pasadena, TX, due to her involvement in an investigation of racketeering activity, 2) that she had witnessed and was attempting to report suspected child abuse involving a Day Care Center at the Domestic Violence Shelter at which she had been staying, and 3) that

17

she had previously worked in the Compliance Unit of the San Francisco Department of Public Health and was aware of the legal requirements regarding HIPAA rights and consent for treatment to which the hospital was not adhering.

Crouse repeated the process of attempting to challenge the validity of the Emergency Detention for mental health hold when she was transferred to West Oaks Hospital, 6500 Hornwood Dr., Houston, TX, on March 27, 2017 but was instead subjected to 7 more days of detention. When she was able to see an attorney on March 29, 2017—5 days after she had been put on Emergency Detention—she stated that she wished to attend the hearing on April 3, 2017 to challenge the validity of the Court Order of Protection for Emergency Detention dated for March 27, 2017. However, she was forced to remain onsite until after the hearing had taken place on April 3, 2017, was denied assistance from either her lawyer or staff at the hospital to attend the hearing, and received no follow-up from her attorney at all.

On April 6, 2017 Crouse filed grievances with both the Texas Medical Board and the Texas Bar Association to seek redress. Neither organization contacted her back. In the meantime, evidence was stolen from her person and she missed the 15-day appeal period to request a rehearing as she awaited response from the Texas Bar Association to assist with legal counsel. The Texas Bar Association had an election for members of its Board of Directors on May, 25,

18

2017; both the Texas Bar Association and the Texas Medical Board are up for review by the Texas Legislature's Sunset Review Commission.

As such this petition further compels consideration of the violations of the Texas Constitution, §26, "Perpetuities and Monopolies", arguing that the 3-day Order of Protection for Emergency Detention for mental health hold that was extended an additional 7 days and the subsequent refusal for the Texas Bar Association and the Texas Medical Board to respond to Crouse in enough time to file an appeal constitute a deliberate attempt to compel her to miss appropriate deadlines for filing and obstruct the gathering and appropriate admission of evidence in a criminal investigation in order to disqualify it, destroy it or otherwise render it inadmissible per §34.5 and §53.2 of the Texas Rules of Appellate Procedure. These sorts of Unconstitutional Acts form the core of the investigation of racketeering activity Crouse had been attempting to report since Feb. 25, 2016.

Also note that there is an error in the submission of this petition as there is no brief to file because the procedure for filing was violated by Guzick and staff at both the Neuropsychiatric Center and West Oaks Hospital in their efforts to obstruct Crouse's appeal.

**Statement of Facts**

This petition seeks to challenge what facts are currently on the record,

namely the justification for the Order of Protection for a 3-day Emergency

Detention for mental health hold that was expanded an additional 7 days. On the

Order of Protection, the justification for the hold was that Crouse 1) was a danger

to herself, 2) was a danger to others, and 3) lacked capacity to make informed

decisions about her treatment. Crouse demonstrated several times that these "facts"

were not fact as she 1) attempted to disclose her participation in an investigation of

racketeering activity and request assistance from staff at the Neuropsychiatric

Center and West Oaks Hospital in dealing with retaliation she was experiencing for

reporting racketeering and child abuse at the Bridge Over Troubled Waters, 2) was

attempting to report child abuse to mandated reporters, as licensed physicians,

social workers and nurses are mandated reporters of child abuse, and 3)

demonstrated several times her capacity to make informed decisions about her

treatment as she repeatedly demonstrated knowledge of the appropriate procedures

for engaging treatment, especially involving controlled substances, and

consistently attempted to assure that any cooperation with staff in terms of

treatment was legally compliant.

Additionally, the Order of Protection states that Crouse told Dr. Nguyen that

she had been previously diagnosed as "bipolar" during the course of earlier

treatment. However, Crouse never stated that she had been diagnosed as such and

never provided Dr. Nguyen with any personal diagnosis history. Rather Crouse had

20

discussed the various diagnoses her mother had been given during the course of her mother's treatment as part of the Patient History Nguyen compiled.  The Order of Protection further lacks any mention of Crouse's attempts to report child abuse or that she was experiencing retaliation for her attempts to report crimes and hence needed protection herself.

There are additional facts that are currently impossible to enter into the record in the appropriate manner because the evidence to support and establish them as fact has been either 1) stolen in the course of further retaliation or attempted coercion to participate in the criminal enterprise Crouse has been investigating, or 2) been obstructed as the appropriate paperwork for establishing facts has been intentionally withheld in violation of the Texas Patients' Bill of Rights, HIPAA and also legal requirements for participants in the Homeless Management Information System (HMIS) for health and human services. This violation of the rules of evidence is itself however a form of evidence in Crouse's ongoing investigation of racketeering activity. One of these intentionally withheld documents attests to the violation of U.S. Code Title 21, Chapter 13, Subchapter I, Part A, §801 (2) in the attempted forced administration of a controlled substance. Attempting to have Crouse identified as mentally ill or otherwise mentally impaired and obstruct efforts to challenge this diagnosis is a deliberate effort to damage the credibility of her role in the investigation and hence constitutes

tampering with evidence or witnesses, a crime under the RICO Act.

## Summary of Argument

This petition seeks an En Banc Review of the Plenary Power of Courts of Appeals for Harris County Probate Court for an Order of Protection for a 3-Day Emergency Detention for mental health hold as eligible under the Texas Safety Code Title 7, Subtitle C, Chapter 573, "Emergency Detention". Crouse was not able to file an appeal to the issuance of a 3-day Emergency Detention for a mental health hold because she filed grievances with the Texas Bar Association and the Texas Medical Board regarding the obstruction of her appeal hearing attendance by staff at the Neuropsychiatric Center, West Oaks Hospital and court-appointed attorney, Arlene Guzick. As a result Crouse missed the 15-day deadline for filing an appeal in the court, however, the Court of Appeal's Plenary Power has not yet expired per §19.1 of the Texas Rules of Appellate Procedure.

As Crouse's detention was issued as retaliation for her role in investigating racketeering activity, acts committed both during and after the detention constitute further evidence in her investigation. That the Texas Bar Association and the Texas Medical Board refused to acknowledge her grievances and assist the investigation reveals their collusion with the crimes against which Crouse was retaliated, specifically that they intentionally obstructed reporting so as to tamper with

22

evidence gathering per §34.5 and §53.2 of the Texas Rules of Appellate Procedure. It is also collusion with witness tampering committed by the Neuropsychiatric Center and West Oaks Hospital under RICO.

Crouse additionally petitions the court to consider how the gravity of the offenses committed in attempting to obstruct her investigation qualify as acts of terrorism per the 1996 Anti-Terrorist and Effective Death Penalty Act, specifically related to kidnapping; drug, arms and human trafficking; extortion; witness tampering; and money laundering. See **Formal Bill of Exception**.

**Argument**

Crouse filed a grievance with the Texas Bar Association on April 6, 2017 and never heard back. Crouse's hearing date to challenge the Order of Protection for an Emergency Detention was on April 3, 2017. According to the Texas Rules of Appellate Procedure (TRAP) Crouse had 15 days to file an appeal for a rehearing concerning the Order of Protection that she was unable to attend because her attorney, Arlene Guzick, did not respond to her request to assist with arranging transport or to discuss with the hospital their legal duty to release her to attend the hearing. As a result Crouse missed the hearing while she was forced to remain at the hospital pending discharge.

Crouse has experienced additional difficulty as a result of the circumstances

surrounding the manner in which she was released, which would have been mitigated had Guzick fulfilled her duty to represent Crouse. No confirmation on the outcome of the hearing or the status of the Court's Order of Protection affirming or contesting the alleged diagnosis has been made available.

Crouse was also told upon release from West Oaks Hospital that she was mandated to sign up for treatment with the Harris County Mental Health and IDD program, formerly known as MHMRA, 9401 Southwest Fwy., Houston, TX, in order to be released. However, after attempting to acquire documentation of her mental health diagnosis from their affiliate, Caroline Street Clinic, 1934 Caroline St., Houston, TX, on May 11, 2017, Crouse learned she is not in the central system for the clinic with which she was coerced into accepting services in order to be discharged. Crouse can also prove that at the time of the detention others used the information that she had been compiling as part of her investigation for the purposes of personal financial profit rather than assist with proper reporting, however, Crouse does not have any confirmation of what financial or other incentive Guzick received to deny fulfillment of her duties to represent her. Crouse further attempted at several junctures to report child abuse and racketeering at the shelter in which she had been staying prior to being put in detention. Crouse told Guzick who neither assisted Crouse with reporting the allegations nor fulfilled her duty to represent Crouse in court to report them.

Additionally, the Texas Bar Association in its publication states that there is no state record for those who have challenged and appealed an Order of Protection for Emergency Detention for a mental health hold. Crouse was not able to attend a court hearing to challenge her hold due to malfeasance on behalf of her attorney, Guzick. The Texas Bar Association refused to address Crouse's grievance with her attorney, Guzick. This demonstrates obstruction in registering potentially illegal Court Orders for Emergency Detentions for mental health holds and seeing to it that they are recorded as such for the purposes of reporting via the Texas Bar Association. There are also issues concerning reports on the numbers related to the last election of the Texas Bar Association's Board of Directors that reveal potential errors with the previous Board of Directors Election that Crouse had been involved with investigating, among other errors regarding Texas Bar Association numbers reporting. These two factors and the recent "online portal" for Texas Bar Private Exchange for Medical Insurance are specifically related to Crouse's investigation of racketeering activity that she was performing in the course of being put on a 3-day Emergency Detention for mental health hold via Order of Protection.

Guzick's refusal to perform her duty to represent Crouse in court to formally address the above matters is the sort of practice that Crouse was specifically investigating in conjunction with the investigation of racketeering activity she had been attempting to report for over a year. Specifically:

25

1)  Guthrick did not respond to or assist Crouse with getting to the hearing that
    Crouse documented she wished to attend.

2)  The Texas Bar Association refused to respond to Crouse's grievance in
    enough time for her to file for a rehearing.

3)  The Texas Bar Association had their Board of Directors election on May,
    25, 2017–a date and event that directly implicates the Texas Bar Association
    in the very racketeering Crouse was reporting and additionally implicates
    them directly in her trafficking through the human services system.

4)  The Texas Bar Association has denied Crouse the right to either appeal the
    Order of Protection against her or assist with her grievance while the Texas
    State Legislature's Sunset Review Commission considers whether or not to
    maintain the Texas Bar Association. This interference in the legislative
    process is the sort of criminal enterprise that Crouse was reporting in her
    investigation of racketeering activity.

Additionally, the Texas Bar Association is also in violation of §26 of the Texas
Constitution by holding up assistance or confirmation on the status of her
grievance so as to compel Crouse to miss necessary filing deadlines.

According to the Texas Medical Board, a complaint that is deemed worthy of
an investigation is opened within 45 days. Crouse filed her grievances with several
practitioners at two hospitals involved with administering and maintaining a 3-Day

26

Emergency Detention for mental health hold that was expanded an additional 7 days on April 6, 2017. Following her grievance more than 45 days passed without any response. In that time, Crouse was presented with no options for challenging the hold and thus continues to be labeled with a mental health diagnosis that was fraudulently obtained. Additionally, several thousands of dollars worth of "healthcare" was spent on Crouse rather than permitting her to avail herself of education assistance, room and board planned prior to the time in which Crouse was hospitalized. Due the length of detention the room and board were no longer available upon her discharge. This violates §26 of the Texas Constitution.

Additionally, Crouse was compelled to engage in the ingestion of controlled substances despite her refusal to consent and with no proper notice by physicians or nurses administering the controlled substance as to what was the specified controlled substance. Crouse was told to sign a paper upon entry to the Neuropsychiatric Center saying she had:

1) Spoken with the doctor about the controlled substances' side effects

2) Discussed with the doctor dosage levels

3) Discussed with the doctor how the controlled substances correlated with her diagnosis

Dr. Nguyen, however, never spoke with Crouse at all about her diagnosis or controlled substance. The nurse who gave Crouse the sheet of paper

simultaneously handed her a cup with pills and told her to take them without discussing what they were. Additionally, two controlled substances were listed on the sheet that Crouse was told to sign but the nurse told her she was administering a controlled substance not listed on the sheet. Crouse signed the sheet with a notation that she had not received the documented services; when she handed the sheet to the nurse and requested to speak in person to Dr. Nguyen the nurse threatened retaliation by assigning Crouse to a more restrictive unit unless she took the controlled substance.

Crouse was never given a copy of the sheet despite requesting it and being entitled to a copy per HIPAA, the Texas Patient's Bill of Rights and HMIS reporting requirements. Crouse was additionally put on the electronic schedule for controlled substance at both the Neuropsychiatric Center and West Oaks Hospital despite refusing to consent to ingesting a controlled substance. She refused consent after her second day at the Neuropsychiatric Center when controlled substances were switched without disclosing why. At West Oaks Hospital Dr. Buttar said she did not need to take the controlled substance unless he got a Court Order because she "accuse[d] people of things". Crouse asked at West Oaks Hospital is patients were a part of a clinical trial for Latuda, as everyone in that particular ward with whom she spoke was prescribed Latuda, and told no. If there was a clinical trial for Latuda, then actions at West Oaks Hospital constitute a violation of U.S. Code

Title 21, Chapter 13, Subchapter I, Part A, §801(2).

The Texas Medical Board is likewise up for review by the Texas Legislature's Sunset Review Commission and their refusal to address Crouse's grievances reveals that they are participating the criminal syndicate Crouse has been reporting and that has trafficked her for over a year. Crouse additionally attempted to report child abuse and racketeering at the Domestic Violence Shelter that sent her to the Neuropsychiatric Center in retaliation. No one from the Texas Medical Board ever assisted Crouse with reporting these crimes despite the fact that licensed practitioners like the ones who are members of the Texas Medical Board are mandated reporters of child abuse.

Due to the 3-day Emergency Detention that was extended an additional 7 days, Crouse was compelled to go to another shelter that was further from the school to which she had already been accepted and was set to begin classes at on March 27, 2017. That shelter, the Salvation Army, 1919 Congress Street, Houston, TX, placed requirements on her movements which would have made it impossible for her to both obtain shelter assistance and attend school. Additionally, while at the shelter, staff attempted to engage Crouse in criminal activities on at least two occasions that Crouse was able to record. These activities were directly related to Crouse's ongoing investigation of racketeering activity and successful commission of these crimes would not have been possible had Crouse not been subjected to the

3-day Emergency Detention that was extended an additional 7 days during the timeframe in which she was held. Crouse left the Salvation Army shelter on April 19, 2017 to remove herself from being an accomplice in the course of this crime. Since then, except for a brief stay at another shelter for 3 days which further revealed the extent of the crimes attached to Crouse's detention, Crouse has been sleeping on the streets while attempting to successfully complete her school program and move forward with her investigation of racketeering activity.

As there was no appearance at appeal there was no way to either enter or not enter evidence that was part of the record, however, had Crouse been able to attend the appeal Crouse would have had considerable primary evidence—including notes and copies of grievances she filed at the Domestic Violence Shelter she was attempting to report as well as a copy of the report she was trying to turn in to be officially put on the record when she went to the the Neuropsychiatric Center— that were stolen from her as she slept on the street following her release. Additionally, had she been able to successfully appeal the Order of Protection and initiate proceedings regarding her investigation, she would have had support and capacity to submit additional evidence acquired from later shelter stays. Specifically, she could have reported three criminal acts staff tried to involve her in regarding:

1) A prisoner set for release who was retaliated against;

2) A financial transaction for the construction of 350 military jets involving a U.S. Senator and a competition for youth held in three cities, including Houston, TX, that is still pending as of May 26, 2017;

3) A large-scale international bank account transfer deal involving entities directly related to publicly-funded healthcare programs.

These criminal acts are connected to other criminal acts that occurred while Crouse was in detention. Due to the nature of the implications regarding the 3-Day Emergency Detention that was extended an additional 7 days and the fact that evidence in a criminal investigation was stolen as a result of factors that emerged following the detention, this petition requests that the En Banc review of the court consider that the investigation that was obstructed by the hold and resulting factors qualifies for application under the 1996 Anti-Terrorist and Effective Death Penalty Act, as the investigation reveals high-level collusion in creating circumstances to kidnap U.S. citizens to be used as financial transaction vehicles in an effort to sell drugs and arms. Among the many contributing factors is creating circumstances in individual's lives that compel them to consider receptivity to efforts to recruit them for the commission of terrorist acts. These efforts have been operationalized through networks that facilitate the trafficking of women, children and men—including U.S. military veterans—through the human services systems. Other crimes that Crouse investigated as part of her investigation of racketeering activity

31

qualify for prosecution under the 1996 Anti-Terrorist and Effective Death Penalty Act. See **Formal Bill of Exception**.

**Prayer**

Crouse asks the court that:

1) An immediate request for appeal of the Harris County Probate Court's issuance of a 3-day Emergency Detention on May 27, 2017 be scheduled.

2) That the court reconsider the prohibition on the rule abrogating the right of trial by jury in the home county of the defendant in disbarment case per the Dec. 20,1971 amendment to the State Bar Bill in light of the nature of the allegations surrounding attorney malfeasance in obstructing a criminal investigation and the collusion of the Texas Bar Association.

3) That an immediate injunction be placed on any commercial, legal or other activity in the state of Texas for Boeing, Inc.; Lockheed Martin, Inc.; or Leonardo S.p.A. and any of their business associates in the development of the T-X Trainer proposed for construction for the U.S. Air Force until such time as allegations regarding their potential collusion with the trafficking of women and children for the purposes of financing this deal or other deals

32

attached to it are investigated and held accountable.

4) That consideration be given to the qualification of various acts reported in the course of Crouse's investigation, including retaliation against her in the course of attempting to rracketeering activity and attendant financial transactions that occurred, qualify as acts of terrorism under the 1996 Anti-Terrorist and Effective Death Penalty Act.

5) That Crouse be given immediate support and protection in moving forward with her case, including responses from and copies of any reports that have been developed by any of the numerous agencies in the City of Chicago and Cook County, the State of Illinois, the City of Houston and Harris County, the State of Texas, and the United Stated federal government that she has attempted to report to since March of 2016.

6) That Crouse additionally receive support in obtaining Court Orders to obtain copies of phone recordings from at least two banks in Chicago as well as access to all medical and other records on her beginning with her first Emergency Detention at San Francisco General Hospital Psychiatric Emergency Services, 1001 Potrero St. San Francisco, CA, in March of 2010 when she was first put into the publicly-funded mental health care system.

# Statutes

**Texas Constitution, Bill of Rights, Article 1. §26**

§26. PERPETUITIES AND MONOPOLIES; PRIMOGENITURE OR ENTAILMENTS. Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed, nor shall the law of primogeniture or entailments ever be in force in this State.

**Texas Constitution, Legislative Department, Article 3, Chapter 65, Subchapter B. §65.011(2)**

(2) a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual;

**Texas Constitution, The Powers of Government, Article 2, Subtitle G, Chapter 81, Subchapter A. "The State Bar Act." §81.077**

§81.077. DISBARMENT PROCEEDINGS. (a) The supreme court may not adopt or promulgate any rule abrogating the right of trial by jury of an accused attorney in a disbarment action in the county of the residence of the accused attorney.

(b) A disbarment proceeding against a resident attorney shall be instituted in a district court in the county of the attorney's residence, but the accused attorney may apply for change of venue under Rule 257, Texas Rules of Civil Procedure.

(c) This chapter does not prohibit a grievance committee from investigating a complaint of professional misconduct alleged to have occurred in the geographical area served by the committee, but any action must be filed in the county of the attorney's residence.

**The Health Insurance Portability and Accountability Act, §164.506 "Consent for Uses or Disclosures to Carry Out Treatment, Payment or Healthcare Operations"**

(a) <u>Standard: consent requirement.</u>

(1) Except as provided in paragraph (a)(2) or (a)(3) of this section, a covered health care provider must obtain the individual's consent, in accordance with this section, prior to using or disclosing protected health information to carry out treatment, payment, or health care operations.

(2) A covered health care provider may, without consent, use or disclose protected health information to carry out treatment, payment, or health care operations, if:

(i) The covered health care provider has an indirect treatment relationship with the individual; or

(ii) The covered health care provider created or received the protected health information in the course of providing health care to an individual who is an inmate.

(3)(i) A covered health care provider may, without prior consent, use or disclose protected health information created or received under paragraph (a)(3)(i)(A)-(C) of this section to carry out treatment, payment, or health care operations:

(A) In emergency treatment situations, if the covered health care provider attempts to obtain such consent as soon as reasonably practicable after the delivery of such treatment;

(B) If the covered health care provider is required by law to treat the individual, and the covered health care provider attempts to obtain such consent but is unable to obtain such consent; or

(C) If a covered health care provider attempts to obtain such consent from the individual but is unable to obtain such consent due to substantial barriers to communicating with the individual, and the covered health care provider determines, in the exercise of professional judgment, that the individual's consent to receive treatment is clearly inferred from the circumstances.

(ii) A covered health care provider that fails to obtain such consent in accordance with paragraph (a)(3)(i) of this section must document its attempt to obtain consent and the reason why consent was not obtained.

(4) If a covered entity is not required to obtain consent by paragraph (a)(1) of this section, it may obtain an individual's consent for the covered entity's own use or disclosure of protected health information to carry out treatment, payment, or health care operations, provided that such consent meets the requirements of this section.

35

(5) Except as provided in paragraph (f)(1) of this section, a consent obtained by a covered entity under this section is not effective to permit another covered entity to use or disclose protected health information.

(b) <u>Implementation specifications: general requirements.</u>

(1) A covered health care provider may condition treatment on the provision by the individual of a consent under this section.

(2) A health plan may condition enrollment in the health plan on the provision by the individual of a consent under this section sought in conjunction with such enrollment.

(3) A consent under this section may not be combined in a single document with the notice required by § 164.520.

(4)(i) A consent for use or disclosure may be combined with other types of written legal permission from the individual (e.g., an informed consent for treatment or a consent to assignment of benefits), if the consent under this section:

(A) Is visually and organizationally separate from such other written legal permission; and

(B) Is separately signed by the individual and dated.

(ii) A consent for use or disclosure may be combined with a research authorization under § 164.508(f).

(5) An individual may revoke a consent under this section at any time, except to the extent that the covered entity has taken action in reliance thereon. Such revocation must be in writing.

(6) A covered entity must document and retain any signed consent under this section as required by § 164.530(j).

(c) <u>Implementation specifications: content requirements.</u> A consent under this section must be in plain language and:

(1) Inform the individual that protected health information may be used and disclosed to carry out treatment, payment, or health care operations;

(2) Refer the individual to the notice required by § 164.520 for a more complete description of such uses and disclosures and state that the individual has the right to review the notice prior to signing the consent;

(3) If the covered entity has reserved the right to change its privacy practices that are described in the notice in accordance with § 164.520(b)(1)(v)(C), state that the terms of its notice may change and describe how the individual may obtain a revised notice;

(4) State that:

(i) The individual has the right to request that the covered entity restrict how protected health information is used or disclosed to carry out treatment, payment, or health care operations;

(ii) The covered entity is not required to agree to requested restrictions; and

(iii) If the covered entity agrees to a requested restriction, the restriction is binding on the covered entity;

(5) State that the individual has the right to revoke the consent in writing, except to the extent that the covered entity has taken action in reliance thereon; and

(6) Be signed by the individual and dated.

(d) Implementation specifications: defective consents. There is no consent under this section, if the document submitted has any of the following defects:

(1) The consent lacks an element required by paragraph (c) of this section, as applicable; or

(2) The consent has been revoked in accordance with paragraph (b)(5) of this section.

## Texas Health and Safety Code, Title 7. Mental Health and Intellectual Disability, Subtitle C. Texas Mental Health Code, Chapter 573. "Emergency Detention"

Sec. 573.001. APPREHENSION BY PEACE OFFICER WITHOUT WARRANT. (a) A peace officer, without a warrant, may take a person into custody if the officer:

(1) has reason to believe and does believe that:

(A) the person is a person with mental illness; and

(B) because of that mental illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and

(2) believes that there is not sufficient time to obtain a warrant before taking the person into custody.

(b) A substantial risk of serious harm to the person or others under Subsection (a)(1)(B) may be demonstrated by:

(1) the person's behavior; or

(2) evidence of severe emotional distress and deterioration in the person's mental condition to the extent that the person cannot remain at liberty.

(c) The peace officer may form the belief that the person meets the criteria for apprehension:

(1) from a representation of a credible person; or

(2) on the basis of the conduct of the apprehended person or the

circumstances under which the apprehended person is found.

**Texas Health and Safety Code, Title 7. Mental Health and Intellectual Disability. Subtitle C. Texas Mental Health Code, Chapter 576. "Rights of Patients"**

**Sec. 576.002. Presumption of Competency.** (a) The provision of court-ordered, emergency, or voluntary mental health services to a person is not a determination or adjudication of mental incompetency and does not limit the person's rights as a citizen, or the person's property rights or legal capacity.

(b) There is a rebuttable presumption that a person is mentally competent unless a judicial finding to the contrary is made under the Texas Probate Code.

**Sec. 576.006. Rights Subject to Limitations.** (a) A patient in an inpatient mental health facility has the right to:

(1) receive visitors;

(2) communicate with a person outside the facility by telephone and by uncensored and sealed mail; and

(3) communicate by telephone and by uncensored and sealed mail with legal counsel, the department, the courts, and the state attorney general.

(b) The rights provided in Subsection (a) are subject to the general rules of the facility. The physician ultimately responsible for the patient's treatment may also restrict a right only to the extent that the restriction is necessary to the patient's welfare or to protect another person but may not restrict the right to communicate with legal counsel, the department, the courts, or the state attorney general.

(c) If a restriction is imposed under this section, the physician ultimately responsible for the patient's treatment shall document the clinical reasons for the restriction and the duration of the restriction in the patient's clinical record. That physician shall inform the patient and, if appropriate, the patient's parent, managing conservator, or guardian of the clinical reasons for the restriction and the duration of the restriction.

**Sec. 576.009. Notification of Rights.** A patient receiving involuntary inpatient mental health services shall be informed of the rights provided by this subtitle:

(1) orally, in simple, nontechnical terms, and in writing that, if

possible, is in the person's primary language; or

      (2) through the use of a means reasonably calculated to communicate with a hearing impaired or visually impaired person, if applicable.

      **Sec. 576.010. Notification of Trust Exemption.** (a) At the time a patient is admitted to an inpatient mental health facility for voluntary or involuntary inpatient mental health services, the facility shall provide to the patient, and the parent if the patient is a minor or the guardian of the person of the patient, written notice, in the person's primary language, that a trust that qualifies under Section 552.018 is not liable for the patient's support. In addition, the facility shall ensure that, within 24 hours after the patient is admitted to the facility, the notification is explained to the patient:

      (1) orally, in simple, nontechnical terms in the patient's primary language, if possible; or

      (2) through a means reasonably calculated to communicate with a patient who has an impairment of vision or hearing, if applicable.

      (b) Notice required under Subsection (a) must also be attached to any request for payment for the patient's support.

      (c) This section applies only to state-operated mental health facilities.

      **Sec. 576.021. General Rights Relating to Treatment.** (a) A patient receiving mental health services under this subtitle has the right to:

      (1) appropriate treatment for the patient's mental illness in the least restrictive appropriate setting available;

      (2) not receive unnecessary or excessive medication;

      (3) refuse to participate in a research program;

      (4) an individualized treatment plan and to participate in developing the plan; and

      (5) a humane treatment environment that provides reasonable protection from harm and appropriate privacy for personal needs.

      (b) Participation in a research program does not affect a right provided by this chapter.

      (c) A right provided by this section may not be waived by the patient, the patient's attorney or guardian, or any other person acting on behalf of the patient.

      **Sec. 576.025.  Administration of Psychoactive Medication.**

      (b) Consent to the administration of psychoactive medication given by a patient or by a person authorized by law to consent on behalf of the patient is valid only if:

      (1) the consent is given voluntarily and without coercive or undue influence;

39

(2) the treating physician or a person designated by the physician provided the following information, in a standard format approved by the department, to the patient and, if applicable, to the patient's representative authorized by law to consent on behalf of the patient:

    (A) the specific condition to be treated;

    (B) the beneficial effects on that condition expected from the medication;

    (C) the probable health and mental health consequences of not consenting to the medication;

    (D) the probable clinically significant side effects and risks associated with the medication;

    (E) the generally accepted alternatives to the medication, if any, and why the physician recommends that they be rejected; and

    (F) the proposed course of the medication;

**Sec. 576.027. List of Medications.** (a) The facility administrator of an inpatient mental health facility shall provide to a patient, a person designated by the patient, and the patient's legal guardian or managing conservator, if any, a list of the medications prescribed for administration to the patient while the patient is in the facility. The list must include for each medication:

    (1) the name of the medication;

    (2) the dosage and schedule prescribed for the administration of the medication; and

    (3) the name of the physician who prescribed the medication.

**U.S. Code Title 21, Chapter 13, Subchapter I, Part A. §801(2)**

The Congress makes the following findings and declarations:

(1) Many of the drugs included within this subchapter have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people.

(2) The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.

(3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because—

    (A)    after manufacture, many controlled substances are transported

in interstate commerce,

    (B)    controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and

(4) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.

(5) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.

(6) Controlled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate. Thus, it is not feasible to distinguish, in terms of controls, between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate.

(7) Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic.

(8) The United States is a party to the Single Convention on Narcotic Drugs, 1961, and other international conventions designed to establish effective control over international and domestic traffic in controlled substances.

## P. Law No. 104-132, 110 Stat. 1214. Anti-Terrorist and Effective Death Penalty Act of 1996, §702.2332b. "Acts of Terrorism Transcending National Boundaries."

(a) PROHIBITED ACTS.—

    (1) OFFENSES.—Whoever, involving conduct transcending national boundaries and in a circumstance described in subsection (b)—

    (A) kills, kidnaps, maims, commits an assault resulting in serious bodily injury, or assaults with a dangerous weapon any person within the United States; or

    (B) creates a substantial risk of serious bodily injury to any other person by destroying or damaging any structure, conveyance, or other real or personal property within the United States or by attempting or conspiring to destroy or damage any structure, conveyance, or other real or personal property within the United States; in violation of the laws of any State, or the United States, shall be punished as prescribed in subsection (c).

    (2) TREATMENT OF THREATS, ATTEMPTS AND CONSPIRACIES.— Whoever threatens to commit an offense under paragraph (1), or attempts or conspires to do so, shall be punished under

subsection (c).

(b) JURISDICTIONAL BASES.—

(1) CIRCUMSTANCES.—The circumstances referred to in subsection (a) are—

(A) any of the offenders uses the mail or any facility of interstate or foreign commerce in furtherance of the offense;

(B) the offense obstructs, delays, or affects interstate or foreign commerce, or would have so obstructed, delayed, or affected interstate or foreign commerce if the offense had been consummated;

(C) the victim, or intended victim, is the United States Government, a member of the uniformed services, or any official, officer, employee, or agent of the legislative, executive, or judicial branches, or of any department or agency, of the United States;

(D) the structure, conveyance, or other real or personal property is, in whole or in part, owned, possessed, or leased to the United States, or any department or agency of the United States;

(E) the offense is committed in the territorial sea (including the airspace above and the seabed and subsoil below, and artificial islands and fixed structures erected thereon) of the United States; or

(F) the offense is committed within the special maritime and territorial jurisdiction of the United States.

(2) CO-CONSPIRATORS AND ACCESSORIES AFTER THE FACT.—Jurisdiction shall exist over all principals and co-conspirators of an offense under this section, and accessories after the fact to any offense under this section, if at least one of the circumstances described in subparagraphs (A) through (F) of paragraph (1) is applicable to at least one offender.

(c) PENALTIES.—

(1) PENALTIES.—Whoever violates this section shall be punished—

(A) for a killing, or if death results to any person from any other conduct prohibited by this section, by death, or by imprisonment for any term of years or for life;

(B) for kidnapping, by imprisonment for any term of years or for life;

(C) for maiming, by imprisonment for not more than 35 years;

(D) for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than 30 years;

(E) for destroying or damaging any structure, conveyance, or other real or personal property, by imprisonment for not more than 25 years;

42

(F) for attempting or conspiring to commit an offense, for any term of years up to the maximum punishment that would have applied had the offense been completed; and

(G) for threatening to commit an offense under this section, by imprisonment for not more than 10 years.

(2) CONSECUTIVE SENTENCE.—Notwithstanding any other provision of law, the court shall not place on probation any person convicted of a violation of this section; nor shall the term of imprisonment imposed under this section run concurrently with any other term of imprisonment.

(d) PROOF REQUIREMENTS.—The following shall apply to prosecutions under this section:

(1) KNOWLEDGE.—The prosecution is not required to prove knowledge by any defendant of a jurisdictional base alleged in the indictment.

(2) STATE LAW.—In a prosecution under this section that is based upon the adoption of State law, only the elements of the offense under State law, and not any provisions pertaining to criminal procedure or evidence, are adopted.

(e) EXTRATERRITORIAL JURISDICTION.—There is extraterritorial Federal jurisdiction—

(1) over any offense under subsection (a), including any threat, attempt, or conspiracy to commit such offense; and

(2) over conduct which, under section 3, renders any person an accessory after the fact to an offense under subsection (a).

**P. Law No. 104-132, 110 Stat. 1214. Anti-Terrorist and Effective Death Penalty Act of 1996. §726. "Addition of Terrorism Offenses to the Money Laundering Statute."**

Section 1956(c)(7) of title 18, United States Code, is amended—

(1) in subparagraph (B), by amending clause (ii) to read as follows:

(ii) murder, kidnapping, robbery, extortion, or destruction of property by means of explosive or fire;''; and

(2) in subparagraph (D)—(A) by inserting after ''an offense under'' the

following:
    "section 32 (relating to the destruction of aircraft), section 37 (relating to violence at international airports), section 115 (relating to influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member),''; (B) by inserting after "section 215 (relating to commissions or gifts for procuring loans)," the following: "section 351 (relating to congressional or Cabinet officer assassination)..."

## Texas Rules of Appellate Procedure, Sec. 26.1, "Civil Cases"
Sec. 26.1. The notice of appeal must be filed within 30 days after the judgment is signed, except as follows:
    (a) the notice of appeal must be filed within 90 days after the judgment is
        signed if any party timely files:
        (1) a motion for new trial;
        (2) a motion to modify the judgment;
        (3) a motion to reinstate under Texas Rule of Civil Procedure 165a; or
        (4) a request for findings of fact and conclusions of law if findings
            and conclusions either are required by the Rules of Civil Procedure
            or, if not required, could properly be considered by the appellate
            court;
    (b) in an accelerated appeal, the notice of appeal must be filed within 20
        days after the judgment or order is signed;
    (c) in a restricted appeal, the notice of appeal must be filed within six
        months after the judgment or order is signed; and
    (d) if any party timely files a notice of appeal, another party may file a
        notice of appeal within the applicable period stated above or 14 days after
        the first filed notice of appeal, whichever is later.

## Texas Rules of Appellate Procedure, §19.1. "Plenary Power of Courts of Appeals"
§19.1. A court of appeals' plenary power over its judgment expires:
    (a) 60 days after judgment if no timely filed motion for rehearing or en banc
reconsideration, or timely filed motion to extend time to file such a motion, is then pending;

## Texas Rules of Appellate Procedure, §34.5. "Clerk's Record"
§34.5 (a) *Contents.* Unless the parties designate the filings in the appellate record

44

by agreement under Rule 34.2, the record must include copies of the following:

(1) in civil cases, all pleadings on which the trial was held;

(2) in criminal cases, the indictment or information, any special plea or defense motion that was presented to the court and overruled, any written waiver, any written stipulation, and, in cases in which a plea of guilty or nolo contendere has been entered, any documents executed for the plea;

(3) the court's docket sheet;

(4) the court's charge and the jury's verdict, or the court's findings of fact and conclusions of law;

(5) the court's judgment or other order that is being appealed;

(6) any request for findings of fact and conclusions of law, any post-judgment motion, and the court's order on the motion;

(7) the notice of appeal;

(8) any formal bill of exception;

(9) any request for a reporter's record, including any statement of points or issues under Rule 34.6(c);

(10) any request for preparation of the clerk's record;

(11) in civil cases, a certified bill of costs, including the cost of preparing the clerk's record, showing credits for payments made;

(12) in criminal cases, the trial court's certification of the defendant's right of appeal under Rule 25.2; and

(13) subject to (b), any filing that a party designates to have included in the record.

**Texas Rules of Appellate Procedure, §53.2. "Contents of Petition"**

§53.2 (k) *Appendix.*

(1) Necessary Contents. Unless voluminous or impracticable, the appendix must contain a copy of:

(A) the judgment or other appealable order of the trial court from which relief in the court of appeals was sought;

(B) the jury charge and verdict, if any, or the trial court's findings of fact and conclusions of law, if any;

(C) the opinion and judgment of the court of appeals; and

(D) the text of any rule, regulation, ordinance, statute, constitutional provision, or other law on which the argument is based (excluding case

law), and the text of any contract or other document that is central to the argument.

## 10 U.S. Code, §948. "Definitions"

(7) Unprivileged enemy belligerent.—The term "unprivileged enemy belligerent" means an individual (other than a privileged belligerent) who—

- A. has engaged in hostilities against the United States or its coalition partners;
- B. has purposefully and materially supported hostilities against the United States or its coalition partners; or
- (C) was a part of al Qaeda at the time of the alleged offense under this chapter.

## 10 U.S. Code, §82. "Jurisdiction of courts-martial not exclusive"

The provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals. This section does not apply to a military commission established under chapter 47A of this title.

## 10 U.S. Code, §836. "President may prescribe rules"

- a. Pretrial, trial, and post-trial procedures, including modes of proof, for cases arising under this chapter triable in courts-martial, military commissions and other military tribunals, and procedures for courts of inquiry, may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not, except as provided in chapter 47A of this title, be contrary to or inconsistent with this chapter.
- b. All rules and regulations made under this article shall be uniform insofar as practicable, except insofar as applicable to military commissions established under chapter 47A of this title.

**10 U.S. Code, §810, Article 10. "Restraint of persons charged with offense"**
Any person subject to this chapter charged with an offense under this chapter shall be ordered into arrest or confinement, as circumstances may require; but when charged only with an offense normally tried by a summary court-martial, he shall not ordinarily be placed in confinement. When any person subject to this chapter is placed in arrest or confinement prior to trial, immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or to dismiss the charges and release him.

**18 U.S. Code, "Racketeer Influenced and Corrupt Organizations (RICO) Act," Part 1, Chapter 96, §1961. "Definitions."**
As used in this chapter—
   (1) "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1351 (relating to fraud in foreign labor contracting), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), sections 1461–1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513

(relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581–1592 (relating to peonage, slavery, and trafficking in persons).,[1] sections 1831 and 1832 (relating to economic espionage and theft of trade secrets), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960 (relating to illegal money transmitters), sections 2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341– 2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), sections 175–178 (relating to biological weapons), sections 229–229F (relating to chemical weapons), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F)

48

any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b(g)(5)(B);

(2) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;

(3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

(6) "unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;

(7) "racketeering investigator" means any attorney or investigator so designated by the Attorney General and charged with the duty of enforcing or carrying into effect this chapter;

(8) "racketeering investigation" means any inquiry conducted by any racketeering investigator for the purpose of ascertaining whether any person has been involved in any violation of this chapter or of any final order, judgment, or decree of any court of the United States, duly entered in any case or proceeding arising under this chapter;

(9) "documentary material" includes any book, paper, document, record, recording, or other material; and

(10)      "Attorney General" includes the Attorney General of the United

States, the Deputy Attorney General of the United States, the Associate Attorney General of the United States, any Assistant Attorney General of the United States, or any employee of the Department of Justice or any employee of any department or agency of the United States so designated by the Attorney General to carry out the powers conferred on the Attorney General by this chapter. Any department or agency so designated may use in investigations authorized by this chapter either the investigative provisions of this chapter or the investigative power of such department or agency otherwise conferred by law.

**Appendix Table of Contents**

1: Copy of grievance filed with Texas Medical Board for Dr. Nguyen on
April 6, 2017                                                    **51**

2: Copy of grievance filed with Texas Bar Association for Arlene Guzick on
April 6, 2017                                                    **52**

3: Copy of grievance filed with Texas Medical Board for Dr. Sayed on
April 6, 2017                                                    **54**

4: Copy of grievance filed with Texas Medical Board for Dr. Buttar on
April 6, 2017                                                    **55**

Blank page                                                      **56**

**Formal Bill of Exception**

This Formal Bill of Exception seeks to asks the Court for an Exception to

the Appeal of the Order of Protection for 3-Day Emergency Detention for mental

health hold that was illegally expanded an additional 7 days as eligible under the

Texas Safety Code Title 7, Subtitle C, Chapter 573, "Emergency Detention". This

57

exception asks that in lieu of considering the Order of Protection for Emergency

Detention of Crouse valid as a means for attempting to legitimately treat Crouse

for an alleged mental health issue the Court instead consider the detention an act of

terrorism as defined under the Anti-Terrorist and Effective Death Penalty Act of

1996. Specifically, the detention was orchestrated as a form of kidnapping an

investigator of racketeering activity; extortion of the investigator as a form of

compelling her to relent on her investigation; attempting to use Crouse as a

financial transaction vehicle to sell military vehicles and carriers of explosive

ordnance to foreign terrorist entities; and witness tampering of a U.S. citizen in the

commission of a terrorist act that transcends U.S. national borders.

Crouse disclosed upon her initial assessments that a primary area of her

investigation involved the application of Presidential Executive Order 13707

"Using Behavioral Science Insights to Better Serve the American People" in the

human services system which she had been documenting for over a year. She

informed the nurse, the social worker and Dr. Nguyen, as well as Dr. Sayed at the

Neuropsychiatric Center as well as Dr. Buttar and the social worker Nicole at West

Oaks Hospital that she had a copy of a report in her attache case that she had

brought with her and that she was attempting to turn it into the appropriate authority. Crouse also informed these same individuals that she had been given a grant by the Department of Education through the Texas Workforce Commission to attend school at Birring NDE, 515 Tristar St., Webster, TX, to study Non-Destructive Testing beginning on March 27, 2017. She also informed them all that not being able to attend on time may jeopardize her grant and would compel her to delay the start of her schooling.

Non-Destructive Testing (NDT) has many applications for a variety of sectors, including the healthcare industry, law enforcement and military applications. Crouse had been studying the textbooks for two courses she was to take at the school prior to being detained and had her textbooks and notes with her in her attache case as well as a copy of the report and other evidence regarding the child abuse and fraud at the shelter she was trying to report. These notes included her assessments and questions about how the techniques related to NDT she was set to study impacted her investigation and may even be the sorts of techniques specifically applied to operationalize the use of behavioral science techniques in the trafficking of human beings—including herself and the women and children at

the Domestic Violence Shelter she was trying to report—as sanctioned by E.O.

13707. Crouse was not permitted to hand in her report. On the Order of Protection,

however, Dr. Nguyen acknowledged Crouse attempted to disclose this

investigation to her when she stated that Crouse accused staff of Bridge Over

Troubled Waters of "performing experiments on her." Crouse had discussed the

details of the E.O. and said that she suspected it was being applied to the children.

Crouse also informed staff that if in fact E.O. 13707 was being applied at

either the Neuropsychiatric Center or West Oaks Hospital then she and others were

to be informed of and availed of the requirements of the Nuremburg Code

governing the use of human test subjects in medical experiments, including

experimental financial transaction models utilizing human beings as subjects of

behavioral science testing. None of the staff at either hospital enforcing her hold

addressed issues with either E.O. 13707 or the Nuremburg Code.

Had staff engaged her in a conversation about E.O. 13707 then Crouse

would have been able to explain that the reason she was sent to the

Neuropsychiatric Center was because on the evening of March 23, 2017 Crouse

had written a note regarding witnessing War Crimes being committed against

children in the Day Care Center after noticing a control group of children being used during the evening meal. The observation happened following an offsite meeting that morning with another woman in the shelter to show her a presentation Crouse developed regarding events at the shelter that women were experiencing, the legal implications of certain actions that staff were taking, and actions women at the shelter could take legally to address the situation. When Janelle spoke with her the next day about the note, Crouse asked her if she was aware of E.O. 13707. Janelle said she was not and when Crouse began to explain what it said Janelle declared that Crouse had made women in the shelter feel unsafe and that she had to either submit to a psychological assessment or arrange a transfer to another shelter. Crouse said she would do both, as she wished to speak with staff at the hospital to report the abuse, understanding they were mandated reporters, and also to arrange for a way to safely exit the situation so as to follow through on her investigation after receiving support and acknowledgement from an appropriate reporting authority.

The unique coordinates surrounding Crouse's investigation and the retaliation to which she was subjected as a result combined with her childhood

61

history growing up on a military bases—which Crouse was compelled to repeat

twice during "Patient Histories" she was required to provide upon intake at each

hospital—and her later professional and personal experiences reporting on human

rights issues, including travel abroad, to subject her to multiple test scenarios while

detained involving the application of behavioral science techniques sanctioned for

use against suspected "alien" or "unprivileged enemy belligerents" as defined by

10 U.S. Code, §948(a)(7) and §821 and §836 related to "Detention, Treatment, and

Trial of Certain Non-Citizens in the War Against Terrorism". Public debate and

legal challenges have been issued regarding several techniques that the U.S.

government and military personnel utilized in the detention and interrogation of

suspected individual terrorists. These techniques included sleep deprivation

techniques similar to the ones that were employed at West Oaks Hospital against

Crouse and others. Crouse specifically protested the practice of staff entering

patient room every 15 minutes throughout the night and engaging in a variety of

activities that resulted in waking or keeping awake people in the room who had not

ingested a sleeping pill to assist with sleeping.

Crouse specifically spoke with Dr. Buttar, the social worker Nicole, and a

technician names Quentin about how the first REM sleep cycle took at least 45 minutes and it did not seem scientifically sound to expect someone to be able to sleep with a deliberate disturbance every 15 minutes. Dr. Buttar responded by telling Crouse that she was still scheduled to receive Benadryl every night before bed to assist with sleeping. Quentin told her that the official hospital policy was to come into patient rooms every 15 minutes, shine a flashlight on their chest and watch for three chest compressions as a safety mechanism. Crouse asked to see a copy of the written policy and was instead briefly showed a paragraph that said that people who had been deemed in need of one-on-one observation required a check-in every 15 minutes, however, there was no mention of this policy being appropriate for the evening and there was no mention of the flashlight or chest compressions.

During the detention, staff also distributed several "activities" that implied they were attempting to test the response of patients to cues to engage in acts of terrorism or infiltration of one sort or another. A specific example involved the distribution of a "word search" that listed reference points for the Phonetic Alphabet employed by both NATO and the U.S. military in an exercise that also

included another "word search" on names of U.S. cities. At another juncture, one late night a staff member entered Crouse's room and immediately went to the bathroom to grab a towel without any lights on and without any opportunity to enter the room and investigate prior to entry. Crouse awoke and asked him what he was doing there and the staff refused to answer. A few days later, Crouse noticed that there were individual cameras in the room itself as well as the bathroom that were never disclosed. These actions show that the staff at West Oaks was testing scenarios that were meant to be applied to individuals not considered eligible for the legal protections acquired to treat U.S. citizens, including a specific enhanced interrogation technique debated publicly for its use by the U.S. military.

Due to the events that occurred during her detention Crouse was later placed in a situation at the shelter to which she was ultimately referred—the Salvation Army—that attempted to broker her as part of a multi-million deal involving companies who had industry connections to the school which she was to attend. This was additionally connected to an event that had happened earlier involving a staff member at the Harris Center for Mental Health and IDD, the organization which administered the health insurance she was placed on without her consent or

64

even knowledge to pay for the detention and forced to agree to accept mental

health services from in order to be discharged from West Oaks Hospital. In later

January of 2016, Crouse had met a man named Richard who claimed to work at

Pathways to Serenity with U.S. military veterans and was part of the Harris Center

for Mental Health and IDD network. He said he was a Navy veteran himself, a

former fighter pilot, and that his son was a current fighter pilot. He also spoke

about an upcoming fighter jet deal that involved pilots using their brainwaves to

control the jets while wearing helmets that cost $400,000. These seemed like mere

conversational points between a military veteran and a daughter of a military

veteran who might have some context for understanding at the time. Richard

offered Crouse a place to sleep indoors for a few nights and also took a copy of her

resume after offering to assist her with obtaining a job. She had additionally

discussed with him how she had been investigating fraud in the social services

system for nearly a year and was working on a report at the time of their meeting.

Crouse stopped sleeping at his place and did not return to speak with him again. He

did not follow up with Crouse.

     While at the Salvation Army on the night of April 19, 2017, she was

contacted about processing a financial transaction without details but with specific

reference points. She refused to accept and ended up leaving the shelter and

noticing that every woman in the shelter—13 in all—were asleep at 7:30 pm. She

contacted via email Sen. Ted Cruz (R-TX) who was alleged to be involved in the

transaction the next day and visited his office to follow up the next week. The

night after she contacted him via email her bag with all of her evidence—including

her report, investigation  notes, textbooks and school notes—were stolen while she

slept on the streets of downtown Houston. She later learned more specifics about

this specific deal, as well as other financial transactions processed through her and

as a result of the detention.

One transaction involved her transfer to West Oaks Hospital on March 27,

2017. Part of her investigation concerned links between political figures in and

from Chicago and members of the Honduran business and political communities.

On March 28, 2016, former Honduran President and FIFA Honduran Federation

Head Rafael Callejas plead guilty in federal court in New York and was sentenced

among other things to forfeit $650,000 worth of bribes to the U.S.; $480,000 of it

was due by the end of a year from the date of his sentencing. Crouse was not given

her official intake at West Oaks until March 29, 2017. Crouse had also discussed

how terms for prisoner release and restitution were part of the investigation of

racketeering activity she had been performing.

The deal involving the award of 350 T-X Trainer jets to one of three

companies in one of three cities is still pending. There are other factors

surrounding the deal and the manner in which the transaction was proposed that

demand immediate investigation for crimes related to the trafficking of women and

children. Had Crouse accepted the terms of the deal implied in the processing of

this transaction, then Crouse would also have accepted the identification with

suspected terrorists attempting to process a financial transaction for military

equipment that carried explosive ordnance and that also used U.S. child citizens as

transactional vehicles. This would qualify under the Anti-Terrorist and Effective

Death Penalty Act of 1996 as providing material support to terrorist entities.

Due to these mitigating factors, including that Crouse was subjected to

behavioral science techniques while at West Oaks that have been sanctioned by the

U.S. military in interrogating "unprivileged enemy belligerents" and suspected

terrorists and that the appropriate procedures for legally engaging U.S. citizens in

healthcare treatment were repudiated, that Crouse was used by staff at multiple

social service agencies to process a financial transaction involving military

vehicles and carriers of explosive ordnance, the Court is asked to consider revising

the hearing to determine whether the above-mentioned acts qualify as acts of

terrorism under the Anti-Terrorism and Effective Death Penalty Act of 1996. The

Court is also asked to consider if the obstruction of the Texas Medical Board and

the Texas Bar Association likewise qualify as aiding and abetting terrorists

kidnapping a U.S. citizen in an effort to undermine the national security of the

United States. The Court is finally asked to investigate the role of the Harris

County Mental Health and IDD in providing material support to terrorist entities

by financing the detention.

**Appendix to Formal Bill of Exception: Statutes**

**Executive Order 13707 of September 15, 2015: "Using Behavioral Science Insights To Better Serve the American People"**

A growing body of evidence demonstrates that behavioral science insights—research findings from fields such as behavioral economics and psychology about how people make decisions and act on them—can be used to design government policies to better serve the American people.

Where Federal policies have been designed to reflect behavioral science insights, they have substantially improved outcomes for the individuals, families, communities, and businesses those policies serve. For example, automatic enrollment and automatic escalation in retirement savings plans have made it easier to save for the future, and have helped Americans accumulate billions of dollars in additional retirement savings. Similarly, streamlining the application process for Federal financial aid has made college more financially accessible for millions of students.

To more fully realize the benefits of behavioral insights and deliver better results at a lower cost for the American people, the Federal Government should design its policies and programs to reflect our best understanding of how people engage with, participate in, use, and respond to those policies and programs. By improving the effectiveness and efficiency of Government, behavioral science insights can support a range of national priorities, including helping workers to find better jobs; enabling Americans to lead longer, healthier lives; improving access to educational opportunities and support for success in school; and accelerating the transition to a lowcarbon economy.

NOW, THEREFORE, by the authority vested in me as President by the Constitution and the laws of the United States, I hereby direct the following:

Section 1. *Behavioral Science Insights Policy Directive.*
(a) Executive departments and agencies (agencies) are encouraged to:
(i) identify policies, programs, and operations where applying behavioral science insights may yield substantial improvements in public welfare, program outcomes, and program cost effectiveness;

(ii) develop strategies for applying behavioral science insights to programs and, where possible, rigorously test and evaluate the impact of these insights;

(iii) recruit behavioral science experts to join the Federal Government as necessary to achieve the goals of this directive; and

(iv) strengthen agency relationships with the research community to better use empirical findings from the behavioral sciences.

(b) In implementing the policy directives in section (a), agencies shall:

(i) identify opportunities to help qualifying individuals, families, communities, and businesses access public programs and benefits by, as appropriate, streamlining processes that may otherwise limit or delay participation— for example, removing administrative hurdles, shortening wait times, and simplifying forms;

(ii) improve how information is presented to consumers, borrowers, program beneficiaries, and other individuals, whether as directly conveyed by the agency, or in setting standards for the presentation of information, by considering how the content, format, timing, and medium by which information is conveyed affects comprehension and action by individuals, as appropriate;

(iii) identify programs that offer choices and carefully consider how the presentation and structure of those choices, including the order, number, and arrangement of options, can most effectively promote public welfare, as appropriate, giving particular consideration to the selection and setting of default options; and

(iv) review elements of their policies and programs that are designed to encourage or make it easier for Americans to take specific actions, such as saving for retirement or completing education programs. In doing so, agencies shall consider how the timing, frequency, presentation, and labeling of benefits, taxes, subsidies, and other incentives can more effectively and efficiently promote those actions, as appropriate. Particular attention should be paid to opportunities to use nonfinancial incentives.

(c) For policies with a regulatory component, agencies are encouraged to combine this behavioral science insights policy directive with their ongoing review of existing significant regulations to identify and reduce regulatory burdens, as appropriate and consistent with Executive Order 13563 of January 18, 2011 (Improving Regulation and Regulatory Review), and Executive Order 13610 of May 10, 2012 (Identifying and Reducing Regulatory Burdens).

Sec. 2. *Implementation of the Behavioral Science Insights Policy Directive.*
(a) The Social and Behavioral Sciences Team (SBST), under the National Science

and Technology Council (NSTC) and chaired by the Assistant to the President for Science and Technology, shall provide agencies with advice and policy guidance to help them execute the policy objectives outlined in section 1 of this order, as appropriate.

(b) The NSTC shall release a yearly report summarizing agency implementation of section 1 of this order each year until 2019. Member agencies of the SBST are expected to contribute to this report.

(c) To help execute the policy directive set forth in section 1 of this order, the Chair of the SBST shall, within 45 days of the date of this order and thereafter as necessary, issue guidance to assist agencies in implementing this order.

Sec. 3. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to a department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) Independent agencies are strongly encouraged to comply with the requirements of this order.

(d) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA
The White House,
*September 15, 2015.*

**The Nuremburg Code, cited in "Trials of War Criminals before the**

**Nuremberg Military Tribunals under Control Council Law No. 10", Vol. 2, pp. 181-182. Washington, D.C.: U.S. Government Printing Office, 1949.**

1. The voluntary consent of the human subject is absolutely essential. This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, over-reaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved, as to enable him to make an understanding and enlightened decision. This latter element requires that, before the acceptance of an affirmative decision by the experimental subject, there should be made known to him the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconveniences and hazards reasonably to be expected; and the effects upon his health or person, which may possibly come from his participation in the experiment.

The duty and responsibility for ascertaining the quality of the consent rests upon each individual who initiates, directs or engages in the experiment. It is a personal duty and responsibility which may not be delegated to another with impunity.

2. The experiment should be such as to yield fruitful results for the good of society, unprocurable by other methods or means of study, and not random and unnecessary in nature.

3. The experiment should be so designed and based on the results of animal experimentation and a knowledge of the natural history of the disease or other problem under study, that the anticipated results will justify the performance of the experiment.

4. The experiment should be so conducted as to avoid all unnecessary physical and mental suffering and injury.

5. No experiment should be conducted, where there is an a priori reason to believe that death or disabling injury will occur; except, perhaps, in those experiments where the experimental physicians also serve as subjects.

6. The degree of risk to be taken should never exceed that determined by the humanitarian importance of the problem to be solved by the experiment.

7. Proper preparations should be made and adequate facilities provided to protect the experimental subject against even remote possibilities of injury, disability, or death.

8. The experiment should be conducted only by scientifically qualified persons. The highest degree of skill and care should be required through all stages of the experiment of those who conduct or engage in the experiment.

9. During the course of the experiment, the human subject should be at liberty to bring the experiment to an end, if he has reached the physical or mental state,

where continuation of the experiment seemed to him to be impossible.

10. During the course of the experiment, the scientist in charge must be prepared to terminate the experiment at any stage, if he has probable cause to believe, in the exercise of the good faith, superior skill and careful judgement required of him, that a continuation of the experiment is likely to result in injury, disability, or death to the experimental subject.